UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NEW CINGULAR WIRELESS PCS, LLC, D/B/A AT&T MOBILITY, a Delaware limited liability company, | Case No. 2:23-cv-00124-AKB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| KOOTENAI COUNTY, IDAHO, | |
| Defendant. | |

## I.  INTRODUCTION

Plaintiff New Cingular Wireless, PCS, LLC d/b/a AT&T Mobility (AT&T) brought this action against Kootenai County (the County), challenging its denial of AT&T's application to construct and operate a 150-foot wireless communication facility. AT&T alleges the denial violated the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7) (the "TCA" or "the Act").

On April 25, 2024, the County filed a summary judgment motion. (Dkt. 35). AT&T opposed the motion and filed a cross-motion for summary judgment, or alternatively, for partial summary judgment. (Dkt. 38). The Court heard oral argument on January 27, 2025. For the reasons discussed below, the Court concludes that substantial evidence supported the County's decision to deny AT&T's application but that the denial constitutes an effective prohibition of coverage in violation of the TCA.

## II.  BACKGROUND

**A.    Factual Background**

AT&T provides wireless telecommunications and personal wireless services to its customers throughout the County and the surrounding regions, including the City of Coeur d'Alene, pursuant to spectrum frequency licenses which the Federal Communications Commission issues. (Dkt. 38-7 at ¶ 3). Spectrum is a finite resource; there are a limited number of airwaves capable and available for commercial use. To ensure service quality, AT&T must use its limited spectrum as efficiently as possible to address customers' existing usage and their forecasted demand for wireless services. (*Id.* at ¶ 4).

AT&T continuously monitors its wireless network to assess its need to improve coverage and capacity to provide reliable and competitive wireless services, and it designs and builds its wireless network to ensure customers receive continuous and uninterrupted outdoor, in-vehicle, and in-building coverage. (*Id.* at ¶ 5). A stronger signal is required for in-building service (as compared to in-vehicle or outdoor service) because signal attenuation occurs when wireless signals pass through solid materials. (*Id.* at ¶ 6).

**1.    AT&T's Identification of Gap in Wireless Coverage**

Consistent with its goal of building and improving its network, AT&T's radio frequency engineers conducted propagation studies of radio frequency signals in the County using an industry-standard computer program which models wireless signal propagation based on detailed inputs. (*Id.* at ¶ 9). Relying on these studies, AT&T identified a gap in its *coverage* in the area north of Coeur d'Alene Lake and southeast of downtown Coeur d'Alene. (*Id.* at ¶ 10). AT&T also identified a gap in service *capacity* in its network within and around Coeur d'Alene, which is currently lacking network capacity due to a limited number of existing AT&T wireless sites in the

City. (*Id.* at ¶ 11). AT&T's proposed facility is intended to provide greater coverage and capacity to these target areas. With the proposed facility, AT&T also plans to provide FirstNet service, a nationwide wireless communications network which is dedicated to first responders' use in the target gap area. (*Id.* at ¶ 12).

    2.    **AT&T's Search for Feasible Sites to Fill the Coverage Gap**

After confirming the existence of the coverage gap, AT&T radio frequency engineers established a "search ring"—a ring on a map showing the area in which a new facility should be constructed to best achieve the specific service objectives. The service coverage gap within the search ring affects approximately 400 single-family homes, two large apartment complexes, a marina, significant portions of Lake Coeur d'Alene, and a roughly two-mile stretch of Interstate 90. (*Id.* at ¶¶ 10, 26). AT&T examined various potential sites for the proposed facility within the search ring. (Dkt. 38-3 at ¶ 14). Additionally, AT&T applied the following required characteristics for a location: the location is zoned to allow for a wireless communication facility; it complies with the County Code's dimensional standards (e.g., setbacks); it has legal access; it meets all practical needs (power and fiber nearby, the grade is buildable); and the landowner is willing to lease a 70' x 70' portion of the property for the cell facility. (Dkt. 38-7 at ¶ 26).

In its location search, AT&T first attempted to collocate on an existing tower. (*Id.* at ¶ 25). To that end, AT&T examined twelve existing towers which could conceivably fill the coverage gap. (AR 1631-1634). Six of the existing towers were immediately eliminated because AT&T already had antennas on those facilities, and an installation there either would cause interference or do little to increase coverage. (AR 1632). Another potential collocation site was eliminated because it was too far (over four miles) from the center of AT&T's search ring to serve the target gap area. (*Id.*). AT&T then reviewed the feasibility of each of the five remaining sites. According

to AT&T, the best of these sites would only provide wireless service coverage to 52.5 percent of the target gap area. (AR 1633). AT&T also examined potential vacant land sites for the facility, but all those sites failed to qualify either because the County Code prescribed minimum lot sizes or minimum setbacks or the sites were eliminated due to challenging topography. (AR 1634).

Because none of the collocation sites were feasible, AT&T ultimately settled on a 7.13-acre undeveloped parcel located on a hill, known as Potlatch Hill, overlooking Lake Coeur d'Alene. AT&T maintains the property is ideal for the proposed facility. The property is well located within the coverage gap area; it is situated where it will be the most efficient solution to remedy AT&T's coverage gap and capacity problems; it is zoned Agricultural Suburban; and it is surrounded by parcels in the County's unincorporated area and by parcels within Coeur d'Alene's city limits. (Dkt. 35-7 at pp. 170-71; AR 160-61). Further, Interstate 90 lies to the south and southwest of the proposed site. (*Id.*). A public road, which the East Side Highway District maintains, provides direct access to the site, and the owner of the parcel agreed to lease the property to AT&T. (Dkt. 38-3 at ¶ 15).

### 3.  AT&T's Application for a Conditional Use Permit

On June 15, 2022, AT&T applied for a conditional use permit (CUP application) from the County to construct and operate a wireless tower on Potlatch Hill. AT&T proposed building a 150-foot-tall steel lattice tower. As proposed, the tower would include a five-foot lightning rod and related ground equipment; would be made of galvanized steel with an anti-glare finish to blend with the surrounding vegetation; and would be within a 70-foot by 70-foot site-obscuring fence. Further, the surrounding mature trees would screen the tower and associated ground equipment. (Dkt. 35-7 at pp. 19-21, 170, 177; AR Vol. 1 pp. 9-11, 160, 167).

With its CUP application, AT&T submitted the required Radio Frequency (RF) Justification report and propagation maps showing: (1) AT&T's existing service coverage around the proposed facility, and (2) the projected service coverage to be gained (a) by the facility at a height of 150 feet, (b) by the facility at a height of 140 feet, and (c) from each of the several potential alternative locations for the facility. (Dkt. 38-7 at ¶ 16; AR 0086, 0087, and 0088). The report also documented AT&T's efforts to find alternative locations.

### a.    Prehearing Staff Report

After AT&T submitted its CUP application, the County's Community Development solicited comments from various agencies with jurisdiction or interest in the application. Although the agency responses expressed some concerns and requested conditions of approval, none of them opposed the project. (AR Vol. 2 pp. 490-504). Community Development also received 136 public comments, nearly all of which opposed the project. (AR Vol. 2 pp. 505-881, Vol. 3 pp. 882-1211). After considering the agency responses and the public's comments, the prehearing staff report recommended approving the application. (*Id.* at p. 178, AR 0168).

In support, the report found, among other things, that:

(1)    the application had met "the requirements for Conditional Use Permit submittals" (AR 0165);

(2)    the collocation on an existing tower was not feasible (AR 166);

(3)    the proposed facility had been designed "to minimize the visual impact to the greatest extent feasible and to blend with the surrounding area" (AR 0166);

(4)    the existing vegetation would be preserved "to the maximum extent possible" and would "assist in screening the facility" (AR 0167); and

(5)    AT&T had determined the proposed location was "the least intrusive site to meet AT&T's service objective within the Targeted Area" after considering alternative sites within a four-mile radius and concluding such alternative sites were not "technologically feasible," which conclusion was supported by AT&T's submission of a proper RF justification."

(*Id.*). Further, the report acknowledged "the concerns raised by the public with regard to aesthetics, light/noise pollution, health concerns, increase of fire risk and limited escape routes" but found those concerns were "adequately addressed." (*Id.* at p. 179; AR 0169). For all these reasons, County staff concluded they "[could] not recommend denial of the proposed Conditional Use Permit at this time." (*Id.*).

### b. The Hearing Process, the Hearing Examiner's Recommendation, and the Board's Initial Decision

The Kootenai County Hearing Examiner held public hearings on the CUP application on August 4 and September 8, 2022. At both hearings, AT&T offered an overview of the project, including visual simulations and engineering information. Nearby residents also attended the hearing, most of whom opposed the project. At the hearings, these residents raised many of the same concerns they raised in their written comments opposing the project, including their concerns about visual intrusions, aesthetics, the dangers associated with lightning strikes, the impact of electromagnetic fields and radio waves on humans and wildlife, the inadequacy of existing roads and other infrastructure to handle the tower's construction and operation, the potential for increased vandalism and the presence of homeless individuals, the reductions in nearby property values, the adequacy of existing communication services, and potential alternative sites. (Dkt. 35-15 at p. 206).

On September 19, 2022, the Hearing Examiner recommended the County deny the CUP application for several reasons, including the proposal's disharmony with the Comprehensive Plan's goals and policies; the safety risks near the proposed site; the lack of scientific data; and the lack of evidence regarding the coverage in the area, alternative sites, and collocation options. (AR Vol. 4 p. 1414-30). The Board of Kootenai County Commissioners conducted its own public hearing on September 29, and despite the Hearing Examiner's recommendation to deny the

application, the Board voted to approve the application by a 2-1 vote, with Commissioner Duncan voting to deny the application. On October 27, the Board issued its written Order of Decision approving the application and reflecting the 2-1 vote.

### c.    County Commissioner Decision Denying CUP Application on Reconsideration

Multiple requests for reconsideration were filed, and the Board held a reconsideration hearing on January 12, 2023. Just before the hearing, Bruce Mattare was sworn in as a County Commissioner and replaced a commissioner who had voted to approve the CUP application. (Dkt. 35-15 at p. 211; AR 1903). On January 26, the Board deliberated and voted 2-1 to reverse its original decision approving the application, with Commissioner Brooks dissenting. (*Id.* at 214; AR 1906). On February 28, the Board then issued a written decision, granting reconsideration and denying the application.

The Board essentially based its denial of the CUP application on the following six findings:

(1) AT&T did not present sufficient evidence that the proposed facility is compatible with existing homes, businesses and neighborhoods, and with the natural characteristics of the area;

(2) AT&T did not adequately address site constraints or hazards and adequately mitigate any negative environmental, social, and economic impacts because it failed to show the proposed facility would not create an enhanced fire risk and would not result in increased annual insurance premiums due to an enhanced fire risk;

(3) AT&T did not adequately demonstrate the proposed facility "would be located where adequate public infrastructure and transportation corridors are or will be available";

(4) AT&T did not adequately demonstrate the proposed facility "would harmonize with the area's natural landscape or that it would complement and preserve rural character to the extent practicable" in accordance with the updated 2020 Comprehensive Plan; and

(5) AT&T did not adequately demonstrate that a significant gap in coverage exists, which the proposed facility would remove, using "real-world data"; and

(6) AT&T did not adequately demonstrate that the proposed facility would represent the least intrusive means of removing that coverage gap.

Based on these findings, the Board concluded that "approval of the proposed telecommunications facility would be in conflict with the [updated 2020] Comprehensive Plan." (Dkt. 35-15; AR 1914-15). Further, the Board concluded that its October 2022 decision approving the CUP application "was in error," based on the following:

(1)   AT&T failed to "satisfactorily show that there are gaps in its coverage with real-world data";

(2)   AT&T failed to "present sufficient evidence that" the Facility was "the least intrusive means available" to address any gaps in coverage;

(3)   AT&T failed to "present sufficient evidence that there is not an enhanced fire risk with the installation" of the Facility;

(4)   AT&T did not "present sufficient evidence that there would not be an economic hardship to the surrounding homes associated with fire insurance, including, without limitation, a potential increase in annual premiums";

(5)   AT&T did not "present sufficient evidence that the [Facility] will be consistent and compatible with the surrounding residential neighborhood"; and

(6)   AT&T did not "present sufficient evidence that the proposal can adequately address site constraints and potential hazards."

(*Id.*; AR 1915-16).

### 4.    AT&T's Expert RF Engineer Conclusions and Additional Drive Test Data

After the County denied AT&T's CUP application, AT&T retained an expert radio frequency engineer, Ozgur Celik, for this litigation. Celik opines that his analysis confirms two significant problems with AT&T's personal wireless service coverage in the subject area: (1) there is a significant service coverage gap in a rural community to the southeast of Coeur d'Alene, which affects approximately 400 single-family homes, two large apartment complexes, a marina, and a roughly two-mile stretch of Interstate 90; and (2) "there is also a significant lack of network capacity in the City of Coeur d'Alene." (Dkt. 38-3 at ¶¶ 12-13). The capacity problem is caused by the limited number of existing on-air AT&T wireless facilities, the service footprints for which are stretched thin to cover a dense population and a large geographic area. (*Id.* at ¶ 13).

###### a.     Updated Propagation Maps

AT&T provides 4G LTE wireless service on certain frequencies, including the 700 MHz and 1900 MHz bands. AT&T maintains its 4G LTE signals are too weak in certain parts of the County to provide adequate and reliable coverage for in-building, in-vehicle, or even outdoor service. (Dkt. 38-7 at ¶ 8). As noted, AT&T included with its CUP application propagation maps which it prepared using an industry-accepted software program to identify and illustrate the coverage gap and to predict the additional 700 MHz 4G LTE service that would result from AT&T's proposed tower. More recently, AT&T RF engineers prepared a series of additional maps, including "before" and "after" propagation maps using Atoll to depict four levels of AT&T's 4G LTE coverage at 700 MHz and 1900 MHz, as well as 5G coverage at 850 MHz, in the target coverage gap area. On these maps, (1) reliable indoor coverage is depicted by green shading; (2) yellow shading depicts areas with reliable in-vehicle coverage but not reliable indoor coverage; (3) pink shading depicts areas with reliable outdoor coverage but not reliable indoor or in-vehicle coverage; and (4) white shading depicts areas with no reliable coverage. (Dkt. 38-3 at ¶ 23).

###### b.     Drive Test Data

In addition to propagation maps, RF engineers also rely on drive test results and maps to evaluate existing coverages and to develop plans to construct new wireless telecommunications facilities. In January 2024, AT&T engaged a vendor, Telnet, Inc., to conduct a drive test to verify the scope of the significant gap in AT&T's 4G LTE and 5G service coverage in the subject area. The drive test data was used to prepare drive test maps for this litigation, which depict each of the thousands of data points of signal strength collected along the drive test route overlaid on a typical road map. (*Id.* at ¶ 27).

Celik, AT&T's expert RF engineer, opines "the drive test results are well-correlated to AT&T's propagation maps," which AT&T submitted initially with its CUP application. (*Id.* at

¶ 29). More specifically, Celik opines "the drive test results for AT&T's 700 MHz 4G LTE and 1900 MHz 4G LTE services identify numerous locations within the target coverage gap where signals are weaker than -88 dBm and weaker than -97 dBm. In these locations, AT&T's customers are not receiving adequate or reliable in-building or in-vehicle service coverage. This confirms with real world data the scope and extent of AT&T's significant service coverage gap in the evaluated portion of the City." (*Id.*).

### c.    Alternative Locations

Additionally, in response to the County's criticism that AT&T had not analyzed the possibility of closing its target gap area by placing one or more new wireless facilities on an extension of existing towers, AT&T prepared coverage maps depicting coverage that could be attained by placing new wireless facilities atop 20-foot extensions of seven existing towers in the broader geographic area. (*Id.* at ¶¶ 30, 32). Celik opines the prepared coverage maps show that AT&T could not provide new in-building service coverage into its target gap area by placing 20-foot extensions on existing facilities. (*Id.* at ¶ 32-41, Exs. 5-13). Celik also opines that "given the terrain and distance between these seven existing towers and AT&T's target gap area, and further given the lack of new in-building coverage that would be attained by placing an AT&T wireless facility 20 feet above the current heights of these towers, there is no combination of new facilities on these existing towers that would propagate new in-building service coverage to AT&T's target gap area." (*Id.* at ¶ 42).

## B.    Procedural Background

Following the County's denial of its CUP application, AT&T filed this action seeking declaratory and injunctive relief. AT&T's complaint alleges four causes of action under the TCA: (1) the County's determination was an unlawful prohibition of service; (2) the County's determination was not based on substantial evidence; (3) the County's failure to take action on

AT&T's application until more than 150 days after submission of the completed application violated the federal "shot clock" rules governing the construction of wireless communication towers; and (4) the County's determination violated Idaho's land use statutes regarding the procedure on motions for reconsideration. Although AT&T still contends the County violated the applicable shot clock before reaching its final decision to deny its CUP application, AT&T has withdrawn its third cause of action alleging a "shot clock" violation because the County ultimately issued a written decision.

### III. LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017). At the summary judgment stage, the trial court must view the evidence in the light most favorable to the nonmoving party. If evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Where parties file cross-motions for summary judgment on the same issue, the court must consider both motions and all evidence submitted by both parties. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Each motion must be considered on its own merits. *Id.* Even if both parties assert no genuine disputes of material fact exist, the court must still review the record and determine disputes of material fact exist. *Id.*

## IV.  ANALYSIS

### A.    The Telecommunications Act

Congress passed the TCA to "encourage the rapid deployment of new telecommunications technologies." *Sprint PCS Assets, L.L.C. v. City of Palos Verdes Ests.*, 583 F.3d 716, 721 (9th Cir. 2009) (quoting Pub. L. No. 104-104, 110 Stat. 56). At the same time, Congress was determined "to preserve the authority of State and local governments over zoning and land use matters." *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 992 (9th Cir. 2009)). To balance these competing interests, the TCA generally preserves the authority of local governments over zoning decisions regarding the placement and construction of wireless service facilities, "but imposes specific limitations on that authority." *T-Mobile S., LLC v. City of Roswell, Ga.*, 574 U.S. 293, 300 (2015) (internal quotation marks omitted).

This case implicates two of those limitations on the County's authority to regulate the siting of AT&T's proposed wireless tower. First, the County's denial of AT&T's CUP application must be "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Second, the County's denial must not "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

The substantial evidence review under the TCA does not create a substantive federal limitation upon local land use regulatory power. *MetroPCS, Inc. v. City & Cnty. of San Francisco*, 400 F.3d 715, 723 (9th Cir. 2005), *abrogated on other grounds by City of Roswell, Ga.*, 574 U.S.

293; *see also* 5 U.S.C. § 706. Rather, the substantial evidence test "requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable *state and local law*." *MetroPCS*, 400 F.3d at 723-24. As the Ninth Circuit has explained, "[t]he upshot is simple: this Court may not overturn the [County's] decision on 'substantial evidence' grounds if that decision is authorized by applicable local regulations and supported by a reasonable amount of evidence." *Id.* at 725.

If, on the other hand, the County's decision denying the CUP application fails the substantial evidence test, it is invalid regardless of the TCA's substantive federal standards. *City of Anacortes*, 572 F.3d at 993 (citing *MetroPCS*, 400 F.3d at 724). The Ninth Circuit has explained this approach enables courts "to avoid unnecessarily reaching the federal questions of whether a zoning decision violates the substantive provisions of the TCA," and has noted that, "in most cases, only when a locality applies the regulation to a particular permit application and reaches a decision—which it supports with substantial evidence—can a court determine whether the TCA has been violated." *Id.* (quoting *MetroPCS*, 400 F.3d at 724).

Thus, the Court first considers whether substantial evidence supports the Board's denial of AT&T's CUP application. *City of Anacorte*s, 572 F.3d at 994. If the Court concludes substantial evidence supports the denial under the applicable local laws, it next considers whether the denial effectively prohibits the provision of wireless services in violation of § 332(c). *City of Anacortes*, 572 F.3d at 994. Even if the Court determines substantial evidence supports the County's decision, that decision may still constitute an effective prohibition in violation of the TCA. *Id.*

**B.    Substantial Evidence Claim**

   **1.    Substantial Evidence Standard**

   "Substantial evidence is more than a scintilla and less than a preponderance, and it consists of such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;

to determine the substantiality of evidence, a court will view the record in its entirety and take account of evidence unfavorable to the agency's decision." *California RSA No. 4 v. Madera Cnty*., 332 F. Supp. 2d 1291, 1301 (E.D. Cal. 2003); *see also Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1053 (9th Cir. 2014). Review under the substantial evidence standard is deferential but must be more than a rubber stamp. *See, e.g.*, *California RSA No. 4*, 332 F. Supp. 2d at 1302-03. In this vein, courts are not bound "to accept as substantial evidence impossible, incredible, unfeasible, or implausible testimony, even if it was not refuted." *Airtouch Cellular v. City of El Cajon*, 83 F. Supp. 2d 1158, 1164 (S.D. Cal. 2000).

AT&T, as the party seeking to overturn the local government's decision, carries the burden of showing that substantial evidence does not support the County's decision. *See Voice Stream PCS I, LLC v. City of Hillsboro*, 301 F. Supp. 2d 1251, 1260 (D. Or. 2004) (finding wireless provider failed to carry burden to show city's decision was not supported by substantial evidence); *California RSA No. 4*, 332 F. Supp. 2d at 1303 (noting absence of Ninth Circuit authority but accepting plaintiff's concession "the burden should be on the communications company") (citing *MetroPCS, Inc. v. City & Cnty. of San Francisco*, 259 F. Supp. 2d 1004, 1010 (N.D. Cal. 2003), and *Second Generation Properties L.P. v. Town Pelham*, 313 F.3d 620, 627 (1st Cir. 2002)). *But see Airtouch Cellular*, 83 F. Supp. 2d at 1164 (accepting parties' stipulation that city bears burden of proof).

2.    **Violation of the Kootenai County Land Use and Development Code and Idaho's Local Land Use Planning Act**

AT&T argues that the Board's denial of its CUP application violated both the Kootenai County Land Use and Development Code ("LUDC") and Idaho law because "the Board had no legal basis upon which to reconsider its original approval, and its very decision to grant reconsideration exceeded its statutory authority." (Dkt. 38-2 at p. 30). AT&T contends the Board

could not reconsider its decision granting the application "unless the original decision was lacking somehow in its explanation for how the application complied with the applicable approval criteria." (*Id.*). Further, AT&T contends that "because the Board's original approval identified and explained how the Application complied with both 'express approval standards' and 'relevant decision criteria,' there could be no legal basis for the reconsideration of [its prior] approval." (*Id.* at p. 31).

Section 8.8.502 of the LUDC provides that "requests for reconsideration shall be limited to the grounds set forth in section 67-6535, Idaho Code." K.C.C. § 8.8.502.  In turn, § 67-6535(2)(a) provides that "failure to identify the nature of compliance or noncompliance with express approval standards or failure to explain compliance with relevant decision criteria shall be grounds for invalidation of an approved permit . . . or denial of same, on appeal." I.C. § 67-6535(2)(a). Section 67-6535(2)(b) further provides that a person seeking reconsideration of a final decision must submit a written request identifying "specific deficiencies in the decision for which reconsideration is sought." "Upon reconsideration, the decision may be affirmed, reversed or modified after compliance with applicable procedural standards." *Id.*

In its reconsideration decision, the Board identified six express standards or decision criteria that it stated the original decision "failed to properly assess." (Dkt. 35-15 at p. 223). Those six concerns included: (1) the adequacy of AT&T's showing concerning the existence of a gap in coverage "using real-world data"; (2) whether the proposed facility was the least intrusive means to fill the alleged gap; (3) whether the proposed facility would present an enhanced fire risk; (4) whether the proposed facility would present an economic hardship to surrounding homes "associated with fire insurance"; (5) whether the proposed facility would "be consistent and compatible with the surrounding residential neighborhood"; and (6) whether AT&T's proposal

could "adequately address site constraints and potential hazards." (*Id.* at pp. 223-24). Based on the Board's finding that the previous decision "failed to identify the nature of compliance or noncompliance with express approval standards, or that it failed to explain compliance or noncompliance with relevant decision criteria," with respect to the concerns outlined above, it concluded "the previous approval of the proposed wireless communications facility was in error, and that the application should be denied." (*Id.* at p. 224).

As this language from the Board's reconsideration decision demonstrates, the Board articulated six express standards or decision criteria, which it believed the previous decision failed to adequately identify or explain. Thus, while AT&T may disagree with the Board's findings and conclusions on reconsideration, the Board stated a valid statutory basis for reconsidering its previous decision. Because the Court finds the Board articulated a valid legal basis for reconsidering its prior approval, the Court next considers the question of whether substantial evidence supports the Board's reconsideration decision.

### 3.     Substantial Evidence Supported the County's Decision

In assessing whether substantial evidence supports the County's denial of the CUP application, the Court looks to Idaho law, and more specifically, the LUDC, which allows for the construction of wireless communication facilities through the conditional use permit process. K.C.C.1 §§ 8.2.309, 8.5.132, 8.8.201; 8.9.503. The LUDC provides the Board must make the following findings to approve a CUP application: (a) the applicable procedural requirements have been met; (b) the proposal complies with the applicable standards for the proposed use without variances, or with such variances as may be approved by the Board; (c) the proposal is compatible with existing homes, businesses, and neighborhoods, and with the natural characteristics of the area; (d) the proposal adequately addresses site constraints or hazards, and adequately mitigates any negative environmental, social, and economic impacts; (e) the services and facilities for the

proposal are available and adequate; (f) the proposal will meet the duly adopted requirements of other agencies with jurisdiction; and (g) the proposal is not in conflict with the comprehensive plan. K.C.C. § 8.8.201(c)(1).

Here, the Board concluded AT&T failed to show that: (1) the proposed facility would be compatible with existing homes, businesses and neighborhoods, and the natural characteristics of the area; (2) it adequately addressed site constraints or hazards and adequately mitigated any negative environmental, social, and economic impacts; (3) it would be located where adequate public infrastructure and transportation corridors are or will be available; and (4) it would not conflict with the comprehensive plan. (Dkt. 35-15 at p. 224). Because the County determined it could not make the findings required for approving the CUP application, the LUDC mandated the Board deny the application. K.C.C. § 8.8.201(c)(1).

In reaching these conclusions, the Board considered the 136 public comments and testimony about the CUP application, most of which opposed the proposed facility. The public comments and testimony, as recognized by the Board in its decision, focused primarily on five concerns: (1) an enhanced fire risk due to lightning strikes, the lack of available water to fight the fire, and the inability of nearby residents to evacuate safely because of accessibility concerns; (2) the dilapidated condition of Potlatch Hill Road and its inability to handle the impacts stemming from the facility's construction and operation; (3) the potential increases in trespass, vandalism, and nuisance; (4) the visual impact on and incompatibility with the surrounding community, particularly to an existing, nearby event business which depends on its natural surrounding; and (5) the economic impacts arising from a potential increase in fire insurance premiums because of increased fire risk and loss of property values.

The Ninth Circuit, as well as other courts, have held that these are legitimate concerns for a locality. *See City of Anacortes*, 572 F.3d at 994-95 (citing *Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 580 (9th Cir. 2008) (stating that the zoning board may consider "other valid public goals such as safety and aesthetics")). Further, constituent testimony and letters, in combination with other evidence or circumstances, can constitute substantial evidence supporting a denial. *See California RSA No. 4*, 332 F. Supp. 2d at 1307-08 (collecting cases); *see also Airtouch Cellular*, 83 F. Supp. 2d at 1165 (finding substantial evidence supported permit denial where, in addition to witness testimony, "the record contain[ed] photographs of the proposed site, reports by the PC's Staff, news articles about the site, and a petition signed by 212 residents opposing the project); *AT&T Wireless PCS v. City Council of Virginia Beach*, 155 F.3d 423, 430 (4th Cir. 1998) (holding that it is proper for legislature and its members to consider constituent testimony as "particularly compelling forms of evidence"). In *City of Anacortes*, for example, the Ninth Circuit found claims by a "number of residents" that a proposed cell tower "would have a detrimental impact on the surrounding residential property, that the pole would not be completely screened, and that it would interfere with residents' views of the Cascade Mountains and other scenic views" constituted "substantial evidence" in support of the city's denial of an application to construct a cell phone tower. *Id.* at 994-95.

Similarly, in this case, more than a "number of residents" submitted comments and testified in opposition to the proposed facility. Their concerns included, among other things, an enhanced fire danger, the visual impacts of the proposed facility, and the dilapidated condition of the road leading to the proposed facility. These concerns are neither implausible nor merely speculative or generalized concerns. To the contrary, some of the comments included extensive presentations and other materials in support of their position. (*See, e.g.*, Dkt. 35-15 at pp. 12-17, 26-35, 46-64;

Dkt. 35-15 at pp. 125-40). Such presentations included photographs showing the condition and steepness of the road leading to the proposed facility and data showing the road does not meet fire safety standards; charts showing the inadequacy of water supply to fight fires near the tower; and numerous references to scientific studies indicating that tall metal telecommunications towers, like the proposed facility, "attract lightning." (*Id.*). The presentations also included evidence that the proposed facility would "be one of the tallest structures in the entire geographic area and by far the tallest of the hills surrounding Coeur d'Alene," making the facility "a lightning rod by its very nature" and even more susceptible to lightning strikes. (Dkt. 35-15 at p. 129).

As the Ninth Circuit concluded in *City of Anacortes*, such evidence is more than a scintilla of evidence. Accordingly, the Court must defer to the County's determination that the evidence was adequate to support its denial of the CUP application under the LUDC. *City of Anacortes*, 572 F.3d at 994-95; *see also City of Palos Verdes Estates*, 583 F.3d at 726 (finding substantial evidence supported denial of application to build tower where city "reviewed propagation maps and mock-ups of the proposed WCFs and a report that detailed the aesthetic values at stake" and "had the benefit of public comments and an oral presentation from Sprint's personnel"). In particular, the residents' safety concerns as it pertains to fire danger and the condition of the road "is a question of police power, not merely another 'Not in My Backyard' complaint." *Airtouch Cellular*, 83 F. Supp. 2d at 1165 (noting the city's decision denying permit "mention[ed] the difficulty of 'assuring the residents of security and safety in their own homes,'" which was "a question of police power, not merely another 'Not in My Backyard' complaint"). These safety concerns, as well as the residents' concerns regarding aesthetics, were not merely generalized or speculative but rather were substantiated by evidence in the written record. (Dkt. 35-9 at pp. 126-203; Dkt. 35-15 at pp. 125-40). In sum, AT&T has not carried its burden to show substantial evidence did not support the

County's decision. The County grounded its denial of the CUP application in the "specifics of the case, not on merely unsupported and vague objections about cellphone towers in general." *Voice Stream*, 301 F. Supp. 2d at 1260.

## C.    Effective Prohibition Claim

As noted, the Ninth Circuit has made clear the effective prohibition standard may be violated even if substantial evidence supports a local authority's decision under the applicable state and local law. *City of Anacortes*, 572 F.3d at 997-98. An effective prohibition occurs when a state or local government "materially inhibits" the provision of services. *City of Portland v. United States*, 969 F.3d 1020, 1034-35 (9th Cir. 2020), *cert. denied, City of Portland v. FCC*, 141 S. Ct. 2855 (2021) (acknowledging "the continuing validity of the material inhibition test"); *In re: Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., Etc.*, 33 FCC Rcd. 9088 (FCC rel. Sept. 27, 2018) ("Infrastructure Order") (material inhibition occurs whenever a denial prevents a wireless provider from providing new services or improving existing services).

A wireless service provider may also establish effective prohibition by showing that: (1) the provider has a significant service gap; and (2) its application proposes to close the gap by the least intrusive means. *MetroPCS*, 400 F.3d at 731; *City of Anacortes*, 572 F.3d at 997-98. A significant gap in service "exists whenever a provider is prevented from filling a significant gap in its own service coverage." *MetroPCS*, 400 F.3d at 733. The "least intrusive" prong requires the provider to show that "the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve." *Id.* at 734 (quoting *APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 480 (3d Cir. 1999)). When a provider makes a prima facie showing that the proposed facility is the least intrusive means of filling a significant gap, the government cannot simply reject the provider's evidence. *City of Anacortes*, 572 F.3d at 998.

Instead, the government must show that there are potentially available and technologically feasible alternatives. *Id.* A speculative alternative is not a viable alternative. *Id.*

1.    **Consideration of Evidence Outside the Administrative Record**

As a threshold matter, the Court determines whether to consider evidence outside the administrative record. Unlike the substantial evidence analysis, "[c]ourts uniformly hold that effective prohibition claims . . . 'present questions that a federal district court determines in the first instance without any deference to the [local zoning] board.'" *AT&T Mobility Servs., LLC v. Vill. of Corrales*, 80 F. Supp. 3d 1267, 1269 (D.N.M. 2014) (quoting *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002) (collecting cases). Although the Ninth Circuit has never squarely addressed whether to consider evidence outside the administrative record in deciding an effective prohibition claim, those courts that have addressed the issue uniformly hold "outside evidence may be essential" to deciding such claims. *Town of Amherst, N.H. v. Omnipoint Commc'ns Enterprises, Inc.*, 173 F.3d 9, 16 n.7 (1st Cir. 1999); *see also Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 49 (1st Cir. 2012); *VoiceStream Minn., Inc. v. St. Croix Cnty.*, 342 F.3d 818, 833 (7th Cir. 2003); *APT Pittsburgh Ltd. P'ship*, 196 F.3d at 475; *Airtouch Cellular*, 83 F. Supp. 2d at 1164.

Despite these uniform authorities, the County asks the Court to limit its reviews of AT&T's effective prohibition claim to the administrative record. The County cites no cases to support its argument—and, in fact, concedes the overwhelming weight of authority runs counter to its position. (Dkt. 35-2 a p. 11) (citing cases). Nonetheless, the County argues outside evidence should not be considered because (1) it "would be inconsistent with the expedited review that both parties have requested"; and (2) "it would be inequitable for this Court to make a decision on AT&T's effective prohibition claim if it were to make a decision based on evidence that the Board did not

have—and could not have had—before it to consider." (Dkt. 35-2 at p. 12). The Court remains unpersuaded by the County's argument.

AT&T's claim that the County's denial of its CUP application had the effect of prohibiting the provision of personal wireless services involves federal limitations on the County's authority and presents questions distinct from those before the County when it decided, under its own ordinance, to deny the application. *Town of Amherst*, 173 F.3d at 16 n.7; *Vill. of Corrales*, 80 F. Supp. 3d at 1269. Contrary to the County's claim, it is *not* "inequitable" for this Court to consider evidence outside of the administrative record in determining, *in the first instance*, AT&T's effective prohibition claim under the TCA—a standalone federal cause of action that does not involve questions of state or local law.

Likewise, this Court's consideration of evidence outside the administrative record is not inconsistent with the parties' request for expedited review. To the contrary, failing to consider evidence outside the administrative record, and instead remanding the claim for the Board to consider, would needlessly prolong this litigation. *VWI Towers, LLC v. Town of N. Andover Plan. Bd.*, 404 F. Supp. 3d 456, 470 (D. Mass. 2019) (citing *Nat'l Tower*, 297 F.3d at 21-22 (finding proper remedy for TCA violations in most cases to be order instructing board to authorize construction)) and *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999) (collecting cases); *see also Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 20 F. Supp. 2d 875, 881 (E.D. Pa. 1998), *aff'd*, 181 F.3d 403 (3d Cir. 1999) ("While this court may simply remand the matter to the Board, we believe that such an action would frustrate the TCA's intent to provide aggrieved parties full relief on an expedited basis."). Thus, the Court may and will rely on evidence outside of the administrative record in evaluating AT&T's effective prohibition claim.

1.    **Significant Gap in Coverage**

As described, the effective prohibition analysis is a two-part test, asking first whether there is a gap in coverage and, second, whether the absence of feasible alternatives to the proposed tower means that denial of an application effectively prohibits all wireless service in the area. *MetroPCS*, 400 F.3d at 731. Here, the parties disagree whether a "significant" coverage gap exists. More specifically, the County contends AT&T has failed to submit certain information and to adequately explain certain information it did submit, which "calls into question whether a true gap in coverage exists, and even assuming that such gap exists, whether it is truly significant for purposes of the "effective prohibition" analysis." (Dkt. 41 at p. 14).

"The significant gap prong is satisfied 'whenever a provider is prevented from filling a significant gap in *its own* service coverage.'" *City of San Diego*, 763 F.3d at 1056 (quoting *MetroPCS*, 400 F.3d at 733). A "wide range of context-specific factors" is used to assess the significance of alleged coverage gaps. *Palos Verdes Estates*, 583 F.3d at 727. These factors include the effects on significant highways or railways, the nature of the area or number of potential customers, the effects on commercial districts, and safety interests. *Id*. Inadequate or unreliable in-building service can be sufficient to show the existence of a significant gap in coverage. *Los Angeles SMSA v. City of Los Angeles*, 2021 WL 3741539, at *4 (C.D. Cal Aug. 24, 2021). Likewise, a gap in a provider's in-home coverage that consists of more than a few isolated pockets of inadequate in-home coverage may suffice to show a significant gap exists. *MetroPCS, Inc. v. City & Cnty. of San Francisco*, No. C02-3442, 2006 WL 1699580, at *10 (N.D. Cal. June 16, 2006), *on remand from* 400 F.3d 715 (9th Cir. 2005).

AT&T has established the significance of the gap in its coverage in the target service area, and the County has made no attempt to challenge AT&T's showing. (Dkt. 38-4 (original propagation maps); Dkt. 38-5 (updated propagation maps); Dkt. 38-3 (AT&T's RF expert

confirming)); (Dkt. 38-6 (drive test results)). In addition, AT&T has submitted evidence showing its service coverage gap affects approximately 400 single-family homes, two large apartment complexes, a marina, a roughly two-mile stretch of Interstate 90, and a portion of Lake Coeur d'Alene. (Dkt. 38-3 Dec. ¶ 12). The County does not dispute this evidence. Moreover, with respect to capacity, AT&T has submitted evidence showing that the target service area currently suffers from a significant lack of network capacity in the City of Coeur d'Alene, which is the result of the limited number of existing on-air AT&T wireless sites serving the core of Coeur d'Alene. (Dkt. 38-3 ¶ 13). Based on this evidence, AT&T has shown the existence of a gap that is more than a mere "dead spot." *T-Mobile W. Corp. v. City of Agoura Hills*, No. CV 09-9077 DSF PJWX, 2010 WL 5313398, at *8-9 (C.D. Cal. Dec. 20, 2010).

By contrast, while the County attempts to poke holes in AT&T's evidence of a coverage gap by claiming certain information is missing or not explained. The County, however, offers *no* contrary evidence to refute AT&T's evidence. Unlike *MetroPCS*, 400 F.3d at 733, in which "the record [was] replete with contradictory allegations as to MetroPCS's need for the [proposed] site, the County offers no expert testimony, no propagation maps, and no other evidence contradicting AT&T's evidence showing a coverage gap. Because the County has submitted no evidence refuting or contradicting AT&T's evidence showing the existence of a significant gap in coverage, summary judgment in favor of AT&T on this issue is appropriate. *C.f. id.* at 734 ("Given the conflicting contents of the record, there is simply no basis for granting either party summary judgment on this issue.").

### 2.    Least Intrusive Means

Having shown the existence of a significant gap in its coverage, AT&T must next show that the Potlatch Hill site is the "least intrusive" on "the values that the denial sought to serve." *See City of Anacortes*, 572 F.3d at 995 (internal quotation marks and citation omitted). The "least

intrusive means" standard contemplates that a wireless provider will have undertaken a "meaningful comparison of alternative sites" to identify "the best solution for the community" in selecting a site for a proposed facility. *See MetroPCS*, 400 F.3d at 734.

AT&T has made a prima facie case showing that the proposed facility is "the least intrusive means" of filling the significant coverage gap by undertaking a "meaningful comparison of alternative sites" to identify "the best solution for the community" in selecting the proposed site. *See id.* at 735. AT&T identified a coverage gap in the area surrounding the proposed site. Its RF engineers established a "search ring" around the gap, where a facility may be technologically capable of addressing the gap. AT&T then searched for, and analyzed, locations in the search ring. In assessing the feasibility of a location, AT&T considered whether the potential site was technologically feasible, leasable, zone-able, and buildable. *City of Anacortes*, 572 F.3d at 998, 999.

As the record shows, AT&T analyzed twelve alternative existing towers for collocation and explained why none were feasible. (Dkt. 35-1 at ¶ 18; Dkt. 38-13 at ¶ 18; Dkt. 41 at p. 2; Dkt. 38-1 at ¶ 34). Additionally, AT&T examined other potential land sites all of which were infeasible because of zoning restrictions or terrain challenges. (Dkt. 38-1 at ¶ 33; Dkt. 41 at p. 2). Of these sites, only the Potlatch Hill site is technologically feasible, leasable, zone-able, and buildable establishing that it is the least intrusive means to fill the gap in coverage. *See City of Anacortes*, 572 F.3d at 998, 999. As a result, AT&T has made a prima facie showing that the proposed facility is the least intrusive, available, and feasible alternative. *See MetroPCS*, 400 F.3d at 735.

Because AT&T made a prima facie showing, the burden of proof shifts to the County to show there are available alternative sites. The County, however, offers no evidence of other

alternatives; instead it offers only speculative, nonspecific suggestions regarding where AT&T might have looked for potential alternatives. Although the County is "not compelled to accept" AT&T's representations, if it rejects them, 'it must show that there are some potentially available and technologically feasible alternatives.'" *New Cingular Wireless PCS, LLC v. Cnty. of Ventura, California*, No. 2:21-CV-03079-SVW (JPRX), 2022 WL 22879626, at *3 (C.D. Cal. Feb. 22, 2022) (quoting *City of Anacortes*, 572 F.3d at 998). It has not done so.

In sum, the Court concludes AT&T has made a prima facie showing of an effective prohibition, and the County has failed to show any potentially available and feasible alternatives to the Potlatch Hill site. Accordingly, the Court concludes the County's denial of AT&T's CUP application violates 47 U.S.C. § 332(c)(7)(B)(i)(II).

## D.    Remedy

AT&T requests that the Court grant "declaratory and injunctive relief in the form of an order compelling the County to issue forthwith a conditional use permit and all other necessary approvals and authorizations to construct, operate, and maintain the Proposed Facility." (Dkt. 1 at ¶ 8). Although the TCA does not specify a remedy for an effective prohibition, "the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits" because "injunctive relief best serves the Act's stated goal of expediting resolution of this type of action." *T-Mobile W. Corp. v. City of Huntington Beach*, No. 10-cv-2835 CAS EX, 2012 WL 4867775, at *19 (C.D. Cal. Oct. 10, 2012) (quoting *Town of Oyster Bay*, 166 F.3d at 497 (cleaned up); *City of Anacortes*, 572 F.3d at 998 (upholding district court's injunction in favor of the provider based on effective prohibition). Thus, because the County's denial of the CUP application amounted to an effective prohibition, the Court grants injunctive relief in favor of AT&T. *See* 47 U.S.C. § 332(c)(7)(B)(i)(II).

## V.  ORDER

**IT IS ORDERED that:**

1. Defendant Kootenai County's Motion for Summary Judgment (Dkt. 35) is **GRANTED in part** and **DENIED in part.**

2. Plaintiff AT&T's Motion for Summary Judgment (Dkt. 38) is **GRANTED in part** and **DENIED in part.**

3. By denying AT&T's CUP application to construct the proposed facility, the County has effectively prohibited AT&T from closing a significant gap in the provision of wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). The County shall therefore issue AT&T the requested conditional use permit and grant all other authorizations necessary for construction and operation of the proposed facility.

DATED: February 20, 2025

Amanda K. Brailsford
**Amanda K. Brailsford**
U.S. District Court Judge